146  407
154  666

Susan B. Anthony et al., Respondents, *v.* The American Glucose Company, Appellant.

A new corporation having been organized by the transfer to it of the property and business of certain original corporations, upon an agreement between the corporators of all of them that payment for the transfer should be made by apportioning to the original stockholders the whole of the stock of the new corporation not reserved for the use of the treasury, certain stockholders in one of the original corporations brought an action against the new corporation for a delivery of its stock to them. *Held,* that the action was maintainable against the new corporation, and that such stockholders were not to be turned over for relief to their own original corporation after by agreement all its functions had ceased, although it might not be wholly dead — it appearing that the new corporation owed a contract duty directly to the individual corporators and not to their corporate entities.

(Argued June 13, 1894; re-argument ordered November 2, 1894; re-argued May 1, 1895; decided June 14, 1895.)

Appeal from an order of the General Term of the Supreme Court in the fifth judicial department, made January 18, 1893, which reversed a judgment entered upon the report of a referee dismissing the complaint upon the merits, and which granted a new trial.

This action was brought to compel the defendant to issue $12,500 of its capital stock to the plaintiffs, Susan B. Anthony and Mary S. Anthony, and to account for and pay over to the plaintiffs the dividends which had been declared thereon since the year 1883, together with other earnings properly distributable upon the plaintiffs' stock.

The referee decided that the remedy of the plaintiffs was not to be sought in an action against the defendant, but in an action against the Leavenworth Sugar Company to compel it to turn over to the plaintiffs their proportionate share of the capital stock of the defendant claimed to have been received by the Leavenworth Sugar Company under the agreement hereafter mentioned, together with other earnings properly distributable upon the plaintiffs' stock, though not declared as dividends.

On and prior to the 21st day of February, 1883, the plaintiffs were the holders of forty shares of the capital stock of

the Leavenworth Sugar Company; and, in the year 1889, by assignment from Daniel R. Anthony, they became the owners and holders of fifty other shares of such capital stock, making ninety shares in all which they now possess.

There existed on the 21st day of February, 1883, a corporation organized under the laws of New Jersey, known as the Firmenich Sugar Refining Company, having its principal office in the city of Buffalo, N. Y., and the Buffalo Grape Sugar Company, and the American Grape Sugar Company, each of which was organized under the laws of the state of New York, having, respectively, their principal business in the city of Buffalo; the Peoria Sugar Refinery, a corporation organized under the laws of Illinois, having its principal office in Peoria, Illinois, and the Leavenworth Sugar Company, organized under the laws of Kansas, having its principal office in Leavenworth, Kansas. Each of these corporations was the owner of a plant for the manufacture of glucose and grape sugar, and each of them was engaged in the business of making and selling those articles. On the 21st day of February, 1883, these five corporations entered into an agreement in writing, with the assent of all the stockholders of each of them, including the plaintiffs and their assignor, Daniel R. Anthony, for the formation of a new corporation to be organized under the laws of the state of New Jersey, to be called the American Glucose Company, with a capital stock of $15,000,000, divided into 150,000 shares of the par value of $100 each. That company is the defendant.

By this agreement all the real estate, buildings, engines, boilers, tools, machinery and fixtures, including everything properly covered by the description of "plant;" and all horses, mules, carts, wagons, harnesses, sleighs and the appurtenances thereof, together with all letters patent and licenses, rights, trade marks and contracts of every nature belonging to each of the parties, was to be vested in the new corporation by proper instruments, and by perfect title, by the tenth day of March of that year, or as soon thereafter as possible. The new corporation, the American Glucose Company, the defendant, was, by the terms of the agreement, vested with a perpetual license to use any processes or machinery in

use in any of the factories of the five above-mentioned corporations, whether owned by such corporations or by any stockholder thereof.

Of the capital stock of the defendant, 125,000 shares, being at par $12,500,000, were allotted to be applied towards the acquisition of the property of the five corporations, and were to be divided as follows: 25,000 shares to the Firmenich Sugar Refining Company, and 100,000 shares to the remaining four corporations ; the residue of the stock, namely, 25,000 shares, was to be retained in the treasury of the defendant.

The defendant became the purchaser in pursuance of this agreement of all of these plants, properties, rights and franchises, together with the materials and supplies, exclusive of the manufactured stock and stock in process of manufacture, of each of these five corporations at the current market value thereof.    It had also the right to purchase the material in process of manufacture in each of these factories, by paying therefor at the rate of two and one-half cents per pound, reduced to finished merchantable goods, with a gravity of forty degrees Beaumé, taken at a temperature of one hundred degrees Fahrenheit; together with all manufactured merchantable goods, inclusive of starch in the starch department of the Buffalo Grape Sugar Company, at a given price.    A clause was inserted providing for the contingency of opposition to this scheme by any stockholder of any of the five old companies to this arrangement; but no opposition seems ever to have been made by any of the stockholders.    Provision was made for a working capital of the defendant in the sum of at least $1,000,000, for which bonds were to be issued bearing interest at the rate of seven per cent per annum, payable semi-annually, in the sum of $100 each, or multiples thereof, amounting in all to the sum of $1,250,000.    Payment of these bonds was secured by mortgage of the new company upon all and singular the property acquired of the old companies, or to be acquired thereafter.

The defendant assumed by this agreement all contracts theretofore made in good faith by any of the five corporations, for the sale of glucose, syrup, grape sugar. starch or feed. but

did not assume any contracts for the sale of mixed or mixing sugar, or any contract involving the testing of any patents or improvements. It also assumed any or all contracts theretofore made in good faith by any of the five corporations or by Cicero J. Hamlin, William Hamlin and Harry Hamlin, or any of them, for the services of any employee, agent or broker, in the factories of either of said corporations, or in their business.

This agreement, which contained other provisions not necessary to be recited in this connection, was consummated on the 17th day of March, 1883, by proper transfers and conveyances executed by these five corporations to the defendant, covering all property real and personal, of the character and description above mentioned; and thereupon the defendant became the absolute owner thereof.

It was shown, and the fact was found by the referee, that Cicero J. Hamlin, William Hamlin and Harry Hamlin were the owners of all the capital stock of the American Grape Sugar Company and of the Buffalo Grape Sugar Company; and of all of the stock of the Peoria Sugar Refinery, except a small portion thereof owned by one Edward F. Easton, and of all the capital stock of the Leavenworth Sugar Company, excepting a small portion thereof which was owned by F. D. Locke, and excepting also the ninety shares which were owned by the plaintiffs and their brother, Daniel R. Anthony. The whole of the capital stock of the Leavenworth Sugar Company was $150,000, at par, in shares of $100 each. William Hamlin was at all of these times, and for years afterwards, the secretary of the American Grape Sugar Company, and secretary and treasurer of the Buffalo Grape Sugar Company, the secretary and treasurer of the Peoria Sugar Refinery, and the secretary and treasurer of the Leavenworth Sugar Company. The Messrs. Hamlin arranged in a manner satisfactory to Locke and Easton for the number of shares of the new company which they should receive in place of those then held by them. They failed, however, to make any effective arrangement with the plaintiffs or with Daniel R. Anthony in this regard. This failure to bring about an adjustment with the Anthonys arose from the fact that the

Messrs. Hamlin insisted, as a condition of a delivery to them of their share of the defendant's stock, that the Anthonys should pay the sum of $11,813.78, being, as was claimed by the Hamlins, an equitable proportion which their stock bore to the whole of the indebtedness of the Leavenworth Sugar Company, which, as they averred, amounted to $196,896.48.

There was, accordingly, issued by the defendant, a certificate for the 900 shares of its capital stock in the name of Daniel R. Anthony; but it was received by William Hamlin, who refused to surrender it or any part of it to Daniel R. Anthony, who was acting for his sisters as well as for himself, except upon the conditions above mentioned.    But the name of Daniel R. Anthony was entered upon the books of the defendant as one of its stockholders to this amount, and notices of subsequent dividends were from year to year sent to him as such stockholder.

Certificates of stock of the defendant were issued to the stockholders of the Firmenich Sugar Refining Company in exchange for their shares in the last-named corporation.  This was done upon the certificate or statement made by the Firmenich Sugar Refining Company.

In the month of October, 1883, after a dividend of two and one-quarter per cent of the capital stock of the defendant had been declared, and notice thereof given to Anthony, payment of Anthony's share was withheld by the direction of the Messrs. Hamlin, subject to an expected settlement between them and Anthony.   After the final failure of such negotiations for a settlement, the Messrs. Hamlin caused the said dividend declared upon the said certificate of stock of the defendant issued in the name of Daniel R. Anthony, to be credited to themselves in three parts, one-third each to Cicero J. Hamlin, William Hamlin and Harry Hamlin.

Subsequently the capital stock of the defendant was reduced from $15,000,000 to $1,500,000, notice of which was given to Anthony with a request that he authorize the cancellation of the 900 shares of the stock which stood in his name, and take in place thereof ninety shares of the reduced capital stock; but to this notice and request Anthony paid no attention.    Afterwards other dividends were declared by the

defendant upon this capital stock, notices of some of which were given to Anthony, and the same have remained unpaid, and have been held in the defendant's account known as unpaid dividend account. All other stockholders of the defendant have been paid their dividends.

The Messrs. Hamlin acquired their stock and controlling interest in the Leavenworth Sugar Company on the 5th day of June, 1882, and immediately thereafter, at a meeting of the stockholders of that company, held at Leavenworth, Kansas, they caused themselves to be elected officers and directors of that company. Immediately after their election as trustees they adjourned their meeting as directors of said company in their office in Buffalo, N. Y., where a meeting was held by Cicero J. Hamlin, William Hamlin, Harry Hamlin and Franklin D. Locke, as directors of said company, on the 10th day of June, 1882, and where all the subsequent meetings of the directors of the said company were held, and where all the meetings of the said four Hamlin companies, so called, were held after the Messrs. Hamlin gained control of them. But no formal meeting of the directors of any of the four Hamlin companies has been held since the making of the agreement by the five corporations to form a new company, and the transfer of the property of said companies to said defendant in pursuance of said agreement of February 21, 1883.

The referee dismissed the complaint of the plaintiffs upon the ground that they cannot maintain this action because no contract relations of any nature exist between the defendant and any of the stockholders of the five corporations entering into the agreement for the organization of the defendant.

The following is the opinion in full:

"There are two theories of the facts of this case: one technically true but substantially an error; the other really true but formally open to criticism; and upon our choice between them will be quite certain to depend the ultimate conclusion. One theory interposes between the parties really interested and actually contracting the corporate entities of the five original companies, and behind that legal shelter seeks to protect the company in default to its stockholders and turn them over for relief to their own original company

after by agreement all its functions had ceased, although possibly it may not be altogether and hopelessly dead. The defense is not meritorious. It simply attempts to substitute circuity of action for direct responsibility, and requires us to blind our eyes with the theoretical abstraction so as to shut out the obvious and undoubted truth. We have of late refused to be always and utterly trammelled by the logic derived from corporate existence where it only serves to distort or hide the truth, and I think we should not hesitate in this case to reject the purely technical defense attempted. For nothing is plainer than that the transfer of the property and business of the five original companies to the new company to be organized was upon an agreement between the corporators of them all that payment for the transfer should be made by apportioning to the original stockholders the whole of the stock of the new company not reserved for the use of the treasury. That agreement is not denied by anybody, and every word and every act of all the companies, and of each and all of the corporators, have proceeded upon that assumption. The companies, as corporate entities, could not alone and without the consent of their constituent members make a transfer which was intended to end their whole practical business existence, and it was agreed by such companies when they made the written contract among themselves, that the refusal of any one corporator in any one company to give his consent to the transfer should turn the proposed sale into a mere lease. The authority of the corporations to sell and to make a valid agreement of sale to which the new company could become a party, was upon the explicit and understood condition that the new stock should be issued in exchange for the old stock to the several corporators, and the necessary consent of the stockholders was given upon that express condition. How fully and perfectly this was understood is obvious from the fact that the offers of the new company to issue its stock to the plaintiffs were always coupled with the condition that the latter should surrender their old stock and cease to be stockholders in the old companies at the moment when they became such in the new. Anthony swears that when he gave his consent to the sale the Hamlins agreed

that he should have the one hundred and twenty-five shares that he claimed as his due proportion of the Glucose Company stock, and that he gave his consent on that basis and upon that condition. None of the Hamlins carry their denial beyond the question of amount. They dispute that, and that only. William Hamlin, in his letter of April 11, 1883, explicitly admits mailing ninety shares to Anthony as being those agreed upon between the parties. There is nowhere a word said by anybody looking to an issue of shares to the corporations instead of to their stockholders.

"Armed with this limited and conditional authority from their corporators, the companies took up their first duty, which was to agree among themselves as to the proportion of stock to be allowed to each as the gross share to which, under the existing parol agreement, their individual members in proper proportions would be entitled. For that purpose the written contract was made. It did settle the gross share of the Firmenich corporation, and the amount of stock to remain unissued, and the amount to go to the corporators of the four Hamlin companies in the lump of one hundred thousand shares, but left unsettled the gross proportion of each of the latter, and so necessarily the share of each individual corporator. The reason of this omission is evident. The Hamlins were the only stockholders in two of the companies, and almost the sole owners of stock in the other two. The only necessary distribution would be to fix the shares of Locke, Easton and Anthony, which, it was assumed, could be done by agreement, and so the gross share of the four Hamlin companies was allotted to them in one amount. Allotted is the word used in the contract instead of issued or paid. It was consistent with the fundamental and existing parol agreement among the corporators. It did not mean, in violation of that agreement and in contempt of the specific authority conferred, that the new stock should be issued to the old companies. It could not mean anything so absurd. They were powerless to surrender the stock of their shareholders in exchange, and to say that the new stock was to be issued to the shells of corporations having no stockholders to whom it could distribute it, unless to the new Glucose Company itself, which alone would possess

the surrendered certificates, is to say that the individual corpo-
rators meant to throw away and utterly waste their rights.
Nothing of the kind was meant, and the word allotted was
fitly used to fix the gross share of the four companies, and
not to authorize, in violation of the fundamental agreement, a
payment or issue to them as partners or tenants in common or
in any manner whatever.

"When the Glucose Company came into existence it had
made no contract and was bound by no obligation. It was
free to buy out the ·five companies on any terms it could
secure, but chose to adopt those offered by such companies and
their corporators. It knew accurately what those terms were
in all their details. Almost every member of the board had
been a party to the arrangement and participated in framing
it, and so, with full knowledge, it adopted the contract
offered, completely and as a whole. It formally accepted the
preliminary contract made between the companies, knowing
that it vested only on condition of an issue of stock to the
corporators, and in buying later the plant at Tippecanoe
it formally agreed to give its stock to the persons interested.
It is thus a mistake to say that the Glucose Company dealt
only with the five corporations. It dealt also and necessarily
with the individual corporators whose consent it required, and
obtaining it on condition of payment to them, and with full
knowledge of that condition, became obligated to each stock-
holder to issue to him his due and proportionate share of Glu-
cose Company stock.

"If we admit that the defendant may not have been bound to
decide proportions among individuals, the result is not changed.
No dispute about them arose until it sprang up between the
Hamlins on one side and Anthony on the other. The latter
claimed 1,250 shares on the original and 125 shares on the
reduced capital, as payable to him; the former insisted that
only 900 shares on one basis and ninety on the other, were due
to Anthony, and it is now fully conceded that the plaintiffs
are entitled on a proper distribution to at least·ninety shares
of the stock of the new company as their due and just pro-
portion. That question as against the Glucose Co. is settled.
It is true that Anthony claimed more, but that the just propor-

tion is at least ninety shares nobody disputes or has ever disputed. It was clearly error to refuse the plaintiffs that except upon the theory that the Glucose Company came under no contract obligation .to the individual stockholders. I think it did, not only by reason of the primary contract of the stockholders. whose benefits it secured and took, but also because by its own conduct it has recognized and adopted that contract. It has issued its stock to every individual stockholder in all the five companies, and never to either one of the companies or by their corporate direction, for there has been since the sale no corporate action of either and its own construction of its own duty should be conclusive.

"Let us examine the defense interposed somewhat more closely.

"It is said the Glucose Company bought solely of the corporate entities, and as matter of law was bound only to pay them. That might have been. If the corporations alone could have made the contract, if the individual stockholders had no privity of contract with the Glucose Company, the contention would have been sound, at least in a court of law. But none of those conditions exist, as I have already sought to show, and the Glucose Company did owe a contract duty directly to the corporators, and stands before us claiming to have tendered full performance of that very contract duty.

"It is said that the Glucose Company issued its allotted stock to the Leavenworth Company, and that ended its contract obligations. The proof relied upon is a formal certificate, No. 11, of 99,400 shares issued to the four Hamlin companies, as partners or holders in common. It was wholly unauthorized. The companies, as I have said, had no right to a share of that stock. They never requested its issue, they never accepted it, and never had it at all. William Hamlin, secretary of the new company and of four of the old ones, all powerful and multiform, and multitudinous of office as he was, nevertheless was not the Leavenworth Company. Its board of directors never met to give a direction about the issue of stock to it, or to any one in its behalf, to accept a tenancy in common creating, possibly, an unlawful partnership, to receive payment of what was not due to it, to surrender shares it did not have, to

return a certificate of which it knew nothing, or to decide what stockholders were entitled to new stock, and in what proportions. All this, the power of William Hamlin, secretary, and as such, authorized to keep the minutes of meetings which had ended, assumed to do. He had no such authority, and the Glucose Company obeyed him at its peril.

"But certificate No. 11 was never a payment or issue of stock, effectively, at all. It was merely a temporary setting aside or allotment of shares out of which, in due season, the actual issue by way of payment was to be made to the individual corporators concededly entitled to receive that payment. Wm. Hamlin, secretary, surrendered it to Wm. Hamlin, secretary, and then told Wm. Hamlin, secretary, to whom the Hamlins directed it to be issued, which was to the Hamlins mainly, except the ninety shares. I do not mean to complain of or criticise that action. These gentlemen who so controlled their corporation practically owned it, and had an honest right to dictate, but the company must take the consequence of its obedience.

"It is said that the four companies and the Hamlins should have been made parties defendant. I do not see that the corporations have the slightest interest in this controversy. The General Term thinks them dissolved and dead. I do not go so far; but if the hollow and empty shells had life enough to stand up before the court as parties defendant, at least they had no interest in the dispute and are in no manner affected by its results.

"Nor were the Hamlins necessary parties. They have received their full shares of stock. Giving ninety shares to the plaintiffs will not affect the admitted proportions of a single stockholder, all of whom have their shares, and at least ninety are left, and there is treasury stock much beyond any amount claimed.

"That defense was suggested on the argument, and pressed as a justification for refusing a delivery to plaintiffs, and was that they ought to pay to the Hamlins about $11,000 as their part of the burden of the debts of the Leavenworth Company.

There were such debts, but there is no finding of their amount, nor who paid them, nor that they have been paid at all, nor that the Hamlins made such payment. The debt may be wholly unpaid, or canceled in the process of consolidation, or assumed and paid by the Glucose Company out of earnings. And even if the plaintiffs are, or ought to be, bound for the payment claimed, there is neither plea, finding nor proof that it was an agreed precedent condition of plaintiffs' right to their due proportion of stock in the consolidated company, nor that any assessment had been lawfully made against the Anthonys or that there was any lien upon the stock due them.

"Equally without foundation is the contention that a certificate to the plaintiffs for ninety shares of the Glucose stock was delivered to the Leavenworth Company for them and that such company was alone in default for the withholding of the stock. There is no proof and no finding that such certificate was ever delivered to the Leavenworth Company or received or accepted by it, or that it became in any manner possessor of the stock. On the contrary, the finding is that it was delivered to William Hamlin without specifying any representative or official character. That he held it as agent of the Glucose Co. and tendered it as such agent is made certain by his letter inclosing it in which he says 'we' have just been able to issue the stock, and 'we' will change its form if necessary. 'We,' can only mean the Glucose Co. and the certificates in Hamlin's hands were still held by that company and tendered by it to the plaintiffs. And besides the certificates if they had been handed to the Leavenworth Co. were clogged with an unlawful condition which the Glucose Co. had no right whatever to impose.

"We think, therefore, that the order of the General Term was right and should be affirmed, with judgment absolute for the plaintiffs upon the stipulation. We are all of opinion, however, that under the peculiar and exceptional circumstances of the litigation, that final judgment can only be for the ninety shares and the dividends and interest thereon. The referee denied plaintiffs' right wholly. The General Term affirmed such right only as to the ninety shares and left

the balance finally defeated. We affirm that order, on the same theory, holding that plaintiffs' claim, as we sustain it, is limited to the ninety shares, and the judgment absolute must recognize what has been decided to be the plaintiffs' right.

" The order should be affirmed, with judgment absolute against the defendant on its stipulation."

*John G. Milburn* for appellant.

*John Van Voorhis* for respondents.

Finch, J., reads for affirmance.
All concur, except Gray and Haight, JJ., not voting.
Ordered accordingly.