(77 App. Div. 525.)

## GORDON et al. v. ASHLEY.

(Supreme Court, Appellate Division, Third Department.   December 3, 1902.)

1. CORPORATION—PROMOTER—CONVEYANCE TO COMPANY—TORT—RESPONSIBIL-
   ITY.
      Defendant took a contract with a village to furnish it with electric
   lights, and built a plant.   Some four months later, and after the plant
   was in operation, a corporation was organized and operated the plant.
   Defendant was president and a majority stockholder.   He testified that
   on the company's organization he sold the plant to it and took stock in
   payment therefor.   The company received all the plant's earnings.   The
   formation of the corporation had been in contemplation from the begin-
   ning.   In an action for negligently maintaining a wire, whereby the
   death of plaintiff's intestate was occasioned, the court instructed that
   unless defendant "had personal effective control" of the plant at the
   time of the accident, and that unless the intestate died from a current
   coming from a wire "controlled and operated" by defendant, he was not
   liable.   Held, that a verdict for plaintiff was contrary to the instructions,
   as, under the facts, the company, and not defendant, was the owner and
   in control of the plant; and this, though defendant's contract with the
   village forbade its assignment.

Appeal from trial term.

Action by Louisa Gordon as administratrix, and Joseph Gordon as
administrator, of the estate of Joseph Gordon, Jr., deceased, against
Eugene L. Ashley, for negligently causing the death of plaintiffs'
intestate.   From a judgment for plaintiffs, entered on a verdict in
their favor, and from an order refusing a new trial on the minutes
(70 N. Y. Supp. 1038), defendant appeals.   Reversed.

Argued before PARKER, P. J., and KELLOGG, SMITH, and
CHASE, JJ.

Richard Lockhart Hand, for appellant.
Lewis E. Carr, for respondents.

PARKER, P. J.   If there is any charge at all, in this complaint,
that the defendant's negligence caused the death of the plaintiffs' in-
testate, it is that he negligently maintained the wire in question.   It
is the use of the wire that is complained of.   No suggestion that
the defendant had created a nuisance in a public place, which had
resulted in the death of the intestate, can be found, and the case was
sent to the jury on that theory only.   They were substantially told
that, unless the defendant had personal effective control of the electric
light plant at the time of Gordon's death, so that it was his legal
duty at his own expense to keep it in proper order, and that unless
Gordon died from an electric current coming from a wire controlled
and operated by the defendant, then the defendant was not liable
for such death, and the plaintiffs could not recover.   This statement
enunciates the rule of law upon which we must assume the jury
acted, and which must control our decision upon this appeal.

The serious question presented, therefore, is whether the evidence
warranted the conclusion, which the jury reached, that the defendant,
Ashley, had any such control and management of the plant at the
time of Gordon's death.   Ashley had taken a contract with the village
of Whitehall to light it with electricity for five years, and he had

built the plant in question. This contract was taken in February, 1898, and the plant seems to have been in operation some time in May of that year. It is manifest that from the start it was contemplated that a corporation should be formed to take and operate the plant, and in June, 1898, a corporation, under the name of the Kane's Falls Electric Company, was fully organized, and from that time the plant was actually operated by such company. The defendant testified that, immediately upon its organization, he sold and transferred to such company all of such plant, and took stock of such company in payment therefor. There is no evidence contradicting such statement. Undoubtedly the company thereafter received all the earnings of such plant, including payments from the village due for lighting it under its contract with Ashley. The stock seems to have been duly transferred to Ashley in payment therefor, and I think it clear that, under the evidence, the company, after June, 1898, must be deemed the owner, as well as the operator, of the plant. There is no evidence whatever suggesting any control or relation between Ashley and the company, other than that of vendor and vendee. There is no claim that the corporation was used as a pretense or cover by Ashley to avoid responsibility. The trial judge substantially told the jury that it was organized in good faith, and in his opinion, delivered upon denying the motion for a new trial, he treats it as an independent legal entity, and thinks that this action might have been properly maintained against it. There is no suggestion in the evidence of any arrangement between Ashley and the company whereby it was to act for him, or as his agent or employé, in lighting the village of Whitehall. It was a sale, and nothing but a sale, of the plant to the company. The company employed Parsons as its electrical engineer and West as its general manager; and I am of the opinion that the clear weight of evidence is to the effect that, at the time Gordon was killed, the company owned the plant, and that it alone was operating it. That being so, the jury were clearly without warrant in concluding that Gordon died from the effects of electricity passing through a wire "controlled and operated by" Ashley, or that Ashley had "the personal effective control of the plant"; and so they were not warranted, under the law of this case as submitted to them by the court, to render a verdict for the plaintiff.

It is urged that Ashley had no right, under the terms of his contract, to assign his rights under it without the consent of the board of trustees, evidenced by a resolution to that effect, and that such resolution was not passed until after Gordon was killed. True; but nevertheless the company did purchase all the plant, and, even if it thereby acquired no right to operate it in Whitehall, nevertheless it did actually operate it with the constant consent of the village. It is a distortion of the evidence to argue that, because Ashley was so forbidden to sell, it must be assumed that the company was acting for him and was at all times under his control. No such arrangement was made between Ashley and the company, and as a matter of fact the village knew that the company was operating the plant, consented to such action, and paid it for so doing. The rights, as between the village and Ashley, or the company, under that con-

tract, do not affect the question as to who had control of the wire that caused the death of Gordon; nor does the fact that Ashley was president of the company and held a very large majority of the stock control that question. Whatever authority he had, or act done in that relation, was the act of the company, and for any negligent omission in that relation the company alone would be liable.

The trial judge has sustained the verdict upon the theory that Ashley erected a public nuisance by suspending this wire in the manner in which it was suspended, and that therefore he was liable for all injury resulting from its use. It is sufficient to say that no such claim has been made in the complaint, no such fact has been charged against him therein, and no such question has been submitted to or passed upon by the jury. Whether the defendant could be held liable, had the action been brought and tried upon such a theory, is not now before us. Upon the evidence appearing in this record, I have very great doubts whether such a claim could be sustained; but it is sufficient here to say that we do not now consider it.

For the reasons above stated, the judgment and order must be reversed, and a new trial granted. All concur.